EL PUEBLO DE PUERTO RICO, recurrido, *v.* RICARDO RODRÍGUEZ TIRADO, peticionario; EL PUEBLO DE PUERTO RICO, recurrido, *v.* EDGAR RODRÍGUEZ MÉNDEZ, peticionario.

*Números:* AC-95-19          *Resueltos:* 5 de junio de 1997
AC-95-20

*Héctor Lugo Bougal, Miguel A. Pérez Vargas* y *Rina J. Cruz Pérez,* abogados de Ricardo Rodríguez Tirado, peticionario; *Eduardo Villanueva Muñoz* y *Julio E. Saavedra González,* abogados de Edgar Rodríguez Méndez, peticionario; *Carlos Lugo Fiol, Procurador General,* y *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogados de El Pueblo.

— o —

Opinión de conformidad emitida por el Juez Asociado Señor Corrada Del Río.

## I

Edgar Rodríguez Méndez y Ricardo Rodríguez Tirado fueron acusados conjuntamente de los delitos de asesinato en primer grado en violación al Art. 83 del Código Penal, 33 L.P.R.A. sec. 4002, por las muertes de Javier Torres Soto y Javier O'Neill González; por el delito de conspiración para cometer el asesinato de Javier O'Neill González, Art. 262 del Código Penal de 1974 (33 L.P.R.A. sec. 4523), y por violar los Art. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418. Rodríguez Méndez también fue-

acusado del delito de conspiración con el propósito de asesinar a Noemí Pagán y conspirar para cometer una agresión agravada grave contra ésta.

Según el Ministerio Público, los hechos que motivaron las acusaciones formuladas son los siguientes:

"El señor Generoso Rodríguez Adames (Palilo), dueño de una mueblería, contrata a unos individuos para que le propinen una paliza a Noemí Pagán, esposa de Ricardo Pereira y empleado de su negocio. Se lleva a cabo el contrato, pero el señor Rodríguez Adames aún no está satisfecho, por lo que decide contratar a otras personas para que maten a Noemí Pagán. A través del acusado, Edgard Rodríguez Méndez, conoce a Javier O'Neill con quien pacta para llevar a cabo el asesinato. Acuerdan el pago de $5,000.00 por el trabajo. Parte de esta negociación se lleva a cabo frente a Angel Luis Vargas Lisojo. Este testigo, además, tiene conocimiento de las intenciones de O'Neill de no llevar a cabo el asesinato pero de cobrar el dinero acordado. También tiene conocimiento del contrato Moisés Rivera Padua, tanto por información que le ofrece Javier O'Neill González, como por conocimiento personal al escuchar a Palilo hablar con O'Neill González.

Posteriormente, Javier O'Neill en compañía de Angel Luis Vargas, finge llevar a cabo el asesinato de Noemí y le informa a Edwin Quiles que ya han cumplido la encomienda, por lo que Quiles le entrega el dinero según acordado por Palilo. Cuando Palilo se entera que ha sido engañado, le advierte a Javier que cumpla con lo convenido o se atenga a las consecuencias. Esta amenaza se produce en presencia de Moisés y del acusado Edgardo Rodríguez, quien con anterioridad también había amenazado a Javier.

El 28 de diciembre de 1993, Palilo y Edwin Quiles se encuentran con O'Neill, Javier Torres y los acusados-recurridos en el negocio 'Sammy's Place'. De ahí salen hacia el lugar de los hechos: Palilo en un vehículo de su propiedad conducido por Edwin Quiles y en otro vehículo se encuentran los acusados y las víctimas. Durante el trayecto, Palilo le dice a Edwin lo siguiente:

'mientras ellos se montaban en el carro, yo le dije a Palilo y ahora y él me dice sigue, entonces seguimos y él me dijo *estás pendiente a un sonido de bocina y que no me asustara, que no dijera nada, y me dijo vas a presenciar las muertes y volvió y me repitió que estuviera pendiente de cuando tocaran bocina para que me parara porque ahí era que los iban a tumbar.* Que inició la marcha del carro y al escuchar la bocina me paré en el lado

izquierdo de la carretera, porque noté que ellos se venían estacionando hacia el lado izquierdo también.'

Luego de detenerse, Edwin ve a través del espejo cuando los dos jóvenes son asesinados. Espera en el vehículo por los acusados y los lleva al estacionamiento de 'Las Cascadas'." (Énfasis en el original.) Caso Núm. AC-95-19, Apéndice, págs. 6–7.

## II

Comenzados los procedimientos judiciales, el 14 de marzo de 1995, uno de los acusados, Rodríguez Méndez, presentó una moción al amparo de la Regla 90 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En la moción se arguyó que las conspiraciones imputadas en su contra, únicamente, "son separadas e independientes totalmente de los casos de asesinato que se le imputan a Ricardo Rodríguez Tirado y Edgar Rodríguez Méndez, por cuanto se trata de fechas separadas, víctimas distintas a las que resultaron muertas en el caso de autos y una línea de eventos que no tiene nada que ver con el caso de asesinato señalado para el 24 de septiembre de 1994". Por esas razones se solicitó que se separara la ventilación del juicio sobre los asesinatos de O'Neill y Torres Soto, las respectivas conspiraciones para llevar a cabo esos asesinatos y la violación de los artículos de la Ley de Armas de Puerto Rico, de la acción sobre conspiración para asesinar a Noemí Pagán.

El 6 de diciembre de 1994, el Ministerio Público se opuso a la moción. El tribunal de instancia celebró una vista el 21 de diciembre de 1994 y declaró con lugar la moción el 11 de enero de 1995, por entender que "los delitos cometidos supuestamente por Edgar Rodríguez Méndez ... son hechos en los cuales los acusados no participaron en el mismo acto o transacción imputada y Ricardo Rodríguez Tirado no fue acusado". Caso Núm. AC-95-19, Apéndice, pág. 39.

Se comenzó posteriormente a ventilar el juicio contra los

acusados Rodríguez Tirado y Rodríguez Méndez por los asesinatos en primer grado, los delitos de conspiración y las imputadas infracciones a la Ley de Armas de Puerto Rico en relación con las muertes de Torres Soto y O'Neill. El Ministerio Público solicitó que se admitieran como evidencia los testimonios de tres (3) de sus testigos, a saber: Ángel Luis Vargas Lisojo, Moisés Rivera Padua y Edwin Quiles Díaz. La defensa solicitó la celebración de una vista al amparo de la Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV, con el propósito de presentar los méritos de su oposición a la admisibilidad del testimonio contenido en las declaraciones juradas previamente prestadas por estos tres testigos.

El 5 de marzo de 1995, el tribunal de instancia celebró la vista y el 17 de marzo de ese mismo año dictó una resolución, la cual indicó que el Ministerio Público incidió al conducir un interrogatorio directo sobre los hechos específicos a las acusaciones de conspiración para asesinar a Noemí Pagán, debiendo haber tomado en cuenta que esos cargos habían sido anteriormente separados para un juicio independiente. El tribunal decidió, además, no permitir el testimonio de Ángel Luis Vargas Lisojo. También decidió no permitir tanto el contenido de la declaración jurada prestada por Edwin Quiles Díaz el 21 de enero de 1993, como una porción substancial del contenido de la segunda declaración jurada prestada por éste el 25 de enero de 1993. Tampoco se declaró admisible la mayoría del testimonio de Moisés Rivera Padua.([2])

Inconforme, el Ministerio Público presentó una petición de *certiorari* y una moción en auxilio de jurisdicción ante el Tribunal de Circuito de Apelaciones, Circuito Regional de

---

([2]) Específicamente, el tribunal de instancia no admitió el testimonio de Ángel Luis Vargas Lisojo; admitió parcialmente el testimonio de Moisés Rivera Padua, de la pág. 3, línea 35, hasta la pág. 4, línea 28, de su declaración jurada; y sobre el testimonio de Edwin Quiles Díaz, encontró admisible sólo desde la pág. 5, línea 13, hasta la pág. 10, línea 17, de su segunda declaración jurada, declarando inadmisible el contenido de la primera declaración.

Mayagüez y Aguadilla. El Tribunal de Circuito de Apelaciones acogió la solicitud del Ministerio Público y ordenó a las partes acusadas que mostraran causa por la cual no se debía revocar la resolución recurrida. Con el beneficio de los escritos, el Tribunal de Circuito de Apelaciones emitió la sentencia cuya revisión nos ocupa, la cual revoca la resolución de instancia recurrida, resolviendo que los testimonios de los testigos son admisibles en su totalidad.

El 10 y el 11 de octubre de 1995, los imputados presentaron sendos escritos de apelación ante este Tribunal, solicitando nuestra revocación del dictamen emitido por el Tribunal de Circuito de Apelaciones. Acogidos los recursos presentados como de *certiorari*, los denegamos mediante una resolución emitida el 28 de diciembre de 1995. El 12 y el 18 de enero de 1996, las partes peticionarias presentaron sendas mociones de reconsideración, sobre las cuales emitimos una resolución el 9 de febrero de 1996. En dicha resolución ordenamos la consolidación de ambos recursos y concedimos al Ministerio Público un término para mostrar causa por la cual no se debía reconsiderar y expedirse los recursos de epígrafe. El Ministerio Público presentó su Escrito en Cumplimiento de Orden el 20 de marzo de 1996, al cual respondió el peticionario Edgar Rodríguez Méndez mediante un escrito presentado el 1ro de abril de 1996.

La controversia que nos ocupa trata sobre si procede la admisibilidad de los testimonios de Moisés Rivera Padua, Ángel Luis Vargas Lisojo y Edwin Quiles Díaz a tenor con las Reglas de Evidencia y el debido proceso de ley.[3]

---

[3] Los peticionarios señalan, respectivamente, los errores siguientes:

"Erró el Honorable Tribunal de Circuito de Apelaciones al Determinar que Procede la Admisibilidad de los Testimonios de Moisés Rivera Padua, Angel Luis Vargas Lisojo y Edwin Quiles Díaz, en Abierta Violación a los Principios Rectores de las Reglas de Evidencia y los Principios Constitucionales que Rigen Dicha Legislación." Caso Núm. AC-95-19, Escrito de apelación (radicado por Ricardo Rodríguez Tirado el 10 de octubre de 1995), pág. 7.

"Erró el Honorable Tribunal Apelativo al revocar en su totalidad la Resolución del Honorable Juez Reinaldo Franqui Carlo, que limitó la prueba admisible a prueba directa, en el sentido de permitir lo que oyó y vio personalmente Moisés Rivera Padua y lo que vio directamente (según éste alega) Edwin Quiles Díaz." Caso Núm.

Para dirimir la controversia, pasamos a analizar el contenido de cada uno de los testimonios impugnados, para luego aplicarles los preceptos de evidencia pertinentes.

Veamos.

## III

*Testimonio de Ángel Luis Vargas Lisojo*

Según surge de su declaración jurada, prestada el 21 de enero de 1994 ante el Ministerio Público, el testimonio de Ángel Luis Vargas Lisojo versa sobre confidencias que le comunicara una de las víctimas, Javier O'Neill. Se explica que el testigo conocía a O'Neill porque había estado casado con la prima de éste.

El testigo declara que el 18 de noviembre de 1993 O'Neill lo fue a buscar para hablar con Rodríguez Adames, porque éste quería pagar para que se asesinara a una señora que residía en el barrio Saltos. O'Neill le expresó a Vargas Lisojo que no iba a llevar a cabo el contrato, pero que iba a "tumbar" el dinero de Rodríguez Adames.

De camino al punto de encuentro con Rodríguez Adames, Vargas Lisojo y O'Neill recogieron a Iván Manzana, conocido como "Manzana". Cuando los tres llegaron a su destino, O'Neill dejó su automóvil (un Hyundai, modelo 1993, color azul, el cual O'Neill le había alquilado a Iván) y se dirigió a donde estaba Rodríguez Adames; Iván y el testigo se quedaron en el carro. Después de varios minutos, O'Neill llamó al declarante a que se acercara. Al estar cerca de los dos hombres, el testigo se percató de que éstos estaban negociando sobre la cantidad que sería pagada por el "servicio" contratado. O'Neill quería diez mil dólares ($10,000), mientras que Rodríguez Adames quería pagar mucho menos. Eventualmente acordaron en cinco mil dó-

---

AC-95-20, Escrito de apelación (radicado por Edgar Rodríguez Méndez el 11 de octubre de 1995), pág. 5.

lares ($5,000) y que el trabajo se llevaría a cabo la noche del día siguiente. Durante esa conferencia, Rodríguez Adames hizo explícitamente claro, en presencia del testigo Vargas Lisojo, que estaba contratando para el asesinato de una señora. Rodríguez Adames no especificó la forma en que se haría el asesinato, pero O'Neill dijo que sería con un tiro.

Terminada la conversación, los tres (3) hombres dejaron el lugar donde habían hablado con Rodríguez Adames y se dirigieron a la casa de Iván Manzana. Luego de dejar allí a Manzana, O'Neill le dijo al testigo que la persona con quien estaban negociando era Rodríguez Adames; que éste tenía una mueblería en San Sebastián, y que éste quería que se diera muerte a la señora porque él estaba "acortejao" con el esposo de ella. O'Neill de nuevo le dijo que le había pedido que lo acompañase a hablar con Rodríguez Adames para que éste creyera que se iba a dar muerte a la mujer; que no tenía intenciones de cumplir con el contrato, pero que pretendía quedarse con los cinco mil dólares ($5,000) de todas maneras.

El testigo indica que la siguiente noche, 19 de noviembre de 1993, a eso de las siete (7:00 P.M.), O'Neill lo recogió en su casa y se dirigieron a un negocio llamado "El Batey". El testigo dice que pasaron alrededor de una (1) hora en el local para que Rodríguez Adames pensara que estaban cumpliendo con el compromiso de dar muerte a la señora indicada. Del establecimiento se dirigieron a la plaza, donde iban a encontrarse con el muchacho que les haría entrega del dinero de Rodríguez Adames. Allí se encontraron con el muchacho (el testigo Quiles Díaz) a quien Vargas Lisojo no conocía. O'Neill le dijo al muchacho que se montara en el automóvil. En el carro, O'Neill le dijo al muchacho que había efectuado el trabajo, por lo que debía buscar el dinero rápidamente, antes de que llegara la Policía. O'Neill condujo al muchacho a una casa para buscar los cinco mil dólares ($5,000). En la casa, el muchacho le en-

tregó a O'Neill cinco (5) pacas de mil (1,000) en billetes de veinte (20), envueltas en un papel crema. El muchacho entonces le pidió dinero a O'Neill y éste le entregó cuarenta dólares ($40). De ahí, O'Neill llevó al testigo a casa de su suegra y se fue. Dos (2) semanas después, O'Neill le dio al testigo doscientos dólares ($200).

El testimonio expuesto, prestado por Vargas Lisojo, fue declarado inadmisible en su totalidad por el tribunal de instancia. Nótese que, en su declaración, Vargas Lisojo no mencionó en ningún momento a los coacusados Rodríguez Tirado y Rodríguez Méndez.

## IV

### Testimonio de Moisés Rivera Padua

Prestada el 25 de enero de 1994 ante el Ministerio Público, la declaración del testigo Moisés Rivera Padua también incumbe el contrato entre Rodríguez Adames y Javier O'Neill. Rivera Padua explicó que conocía a O'Neill porque éste era sobrino de su hermana y su vecino. El testigo también conocía a Rodríguez Adames, ya que le había comprado equipo de música a éste.

Ese testigo juró en la declaración que, en la noche de 15 de noviembre de 1995, O'Neill y él se dirigieron al negocio "El Batey" en San Sebastián, en un automóvil Mirage nuevo, color azul. Allí, Rodríguez Adames les encontró para ofrecerle a O'Neill un contrato para que llevara a cabo un asesinato. El testigo escuchó a Rodríguez Adames preguntarle a O'Neill si se atrevía matar a una persona. Éste contestó en la afirmativa, por lo que Rodríguez Adames le ofreció cinco mil dólares ($5,000) por el trabajo. Terminada esa conversación, O'Neill y Rivera Padua se dirigieron a la casa de éste. De camino, O'Neill le dijo al testigo que iba a llevar a cabo el trabajo contratado con Rodríguez Adames.

Surge de la declaración que O'Neill recapacitó y que le dijo al testigo que no iba a matar a la persona, pero que iba

a coger el dinero de Rodríguez Adames. Se declara también que, en efecto, O'Neill no llevó a cabo la encomienda y que, posteriormente, le dijo al testigo que Rodríguez Adames estaba "enfogonao"; que éste quería que se le devolviera el dinero o se completara el trabajo.

Para la segunda mitad del mes de noviembre, el testigo acompañó a O'Neill al *Tasty Freeze* de San Sebastián. Allí se encontraron con el coacusado Edgar "Gardy" Rodríguez Méndez. Rodríguez Méndez le preguntó a O'Neill porqué no había completado el trabajo por el que pagó Rodríguez Adames y qué iba a hacer al respecto. O'Neill pidió más tiempo. Rodríguez Méndez estaba "enfogonao" y le dijo a O'Neill, en presencia de Rivera Padua, que se atuviera a las consecuencias.

Luego de salir del *Tasty Freeze*, O'Neill le dijo al testigo que tenían que hacer un asalto para conseguir el dinero. El testigo le sugirió asaltar una joyería que él visitaba.

El 16 de noviembre de 1991, a las 7:30 de la noche, O'Neill buscó a Rivera Padua en un carro Toyota 1.6, nuevo, color amarillo, que éste había comprado. En éste, ambos fueron a *Sammy's Pool*. Allí se encontraron con Rodríguez Adames y Rodríguez Méndez. En presencia del testigo, Rodríguez Adames le preguntó a O'Neill qué iba a hacer, ya que " 'me cogistes de pendejo, me tirastes una bomba .... busca los chavos o haz el trabajo o atente a las consecuencias". Caso Núm. AC-95-20, Apéndice, pág. 12. O'Neill le pidió tiempo.

Al salir del local O'Neill y el testigo, hablaron de nuevo sobre el robo de la joyería como la forma de conseguir el dinero que sería devuelto a Rodríguez Adames. O'Neill adelantó el asalto de la joyería dos (2) veces, del 1ro de enero al 30 de diciembre, y luego al 28 de diciembre. Ese día 28, entre las doce y una del día (12:00 A.M. y 1:00 P.M.), O'Neill visitó, en su automóvil amarillo, a Rivera Padua para pedirle que fueran a efectuar el robo de la joyería. El testigo le dijo que no lo podía acompañar porque tenía que

ir al trabajo. Esa noche, entre las 8 y 8:30 P.M., O'Neill llamó a Rivera Padua al teléfono de su trabajo, le dijo que Ricky (el coacusado Ricardo Rodríguez Tirado) lo había llamado y le había dicho que tenía que encontrarse con Rodríguez Adames, Rodríguez Méndez y con él en *Sammy's Pool*. O'Neill le pidió al testigo que le acompañara a esa reunión; éste contestó que no podía hacerlo porque tenía que trabajar.

Luego de los asesinatos de Torres Soto y O'Neill, la Policía entrevistó a Rivera Padua, quien declaró que un tal Miguel Masallo, a quien el testigo conocía de vista, había contratado a Javier O'Neill para que, por dinero, asesinara a una persona. Sin embargo, durante esta declaración jurada, el testigo alega que no brindó el nombre de Rodríguez Adames, quien en verdad había ofrecido el contrato, porque temía que éste contratara por su muerte.

El tribunal de instancia declaró inadmisible la mayoría de esta declaración. Sólo se admitió como evidencia los hechos relevantes a la conversación que, el 16 de noviembre de 1991, Rodríguez Adames, Rodríguez Méndez y O'Neill sostuvieron en presencia del testigo.

## V

*Testimonio de Edwin Quiles Díaz*

El tercer testigo, Edwin Quiles Díaz prestó dos (2) declaraciones juradas. En su declaración de 21 de enero de 1993, el testigo indicó que se desempeñaba como empleado de Rodríguez Adames en su mueblería, localizada en San Sebastián. El testigo declaró que Rodríguez Adames le entregó mil dólares ($1,000) al testigo para que se los hiciera llegar a unos individuos como compensación por propinar una paliza a Ricardo Pereira y Noemí Pagán, pero que Rodríguez Adames, aún inconforme, contrató a O'Neill.

Quiles Díaz, a quien también se conoce como "Motora", testificó que entre las 12:30 y 1 de la tarde de 18 de no-

viembre de 1993, se encontraba trabajando en la mueblería cuando Rodríguez Adames le presentó a Javier O'Neill. Rodríguez Adames presentó a Quiles Díaz como su "mano derecha". Rodríguez Adames le dijo que le iba a dar un dinero para que se lo entregara el día siguiente en la plaza a O'Neill, quien era una persona de su confianza que le iba a hacer un trabajo. Ese mismo día, O'Neill y el testigo acordaron encontrase para la entrega durante la noche de 19 de noviembre en la plaza.

El testigo indicó que el 19 de noviembre de 1993, Rodríguez Adames le dijo que el coacusado Rodríguez Méndez le había recomendado a O'Neill para que le hiciera el trabajo de asesinar a Noemí Pagán, la esposa de Ricardo Pereira. Rodríguez Adames dijo querer la muerte de esa mujer porque Ricardo decía que ella lo había obligado a renunciar al trabajo y porque ella decía que Rodríguez Adames y Ricardo tenían relaciones sexuales, obligadas por Rodríguez Adames. Rodríguez Adames le hizo entrega a Quiles Díaz del dinero ese mismo día y éste se llevó el paquete para su casa.

De su casa, el testigo salió con el paquete para la plaza, donde a las 7 de la noche se encontró con O'Neill y Ángel Luis "Moyi" Vargas Lisojo. Quiles Díaz les informó que tenía el dinero, pero que Rodríguez Adames le había ordenado que no entregara el dinero hasta que se llevara a cabo el trabajo. Entonces, O'Neill le dijo que iba a cumplir con su parte del contrato y que volvería para buscar el dinero. Dos (2) horas más tarde, aún en la plaza, el testigo volvió a encontrarse con los dos (2) hombres. O'Neill le "hizo un teatro como que supuestamente había hecho el trabajo", y le dijo que se montara en un carro Hyundai azul para que fueran a buscar el dinero. De ahí, los tres se dirigieron a la casa del testigo donde éste buscó y entregó el dinero. Quiles Díaz declaró que por ese servicio Rodríguez Adames le recompensó trescientos dólares ($300).

Posteriormente, mientras Quiles Díaz se desempeñaba en su trabajo, Rodríguez Adames le preguntó si le había dado el dinero a O'Neill, a lo que el testigo contestó en la afirmativa. Rodríguez Adames, entonces, le dijo que O'Neill "no había hecho nada", que estaba furioso con el incumplidor y que "el que se la hacía a él se la pagaba". Caso Núm. AC-95-19, Apéndice, pág. 71. El tribunal de instancia declaró inadmisible el contenido de esta primera declaración jurada de Quiles Díaz. El 25 de enero de 1994, Quiles Díaz prestó su segunda declaración jurada. El testigo prestó esta declaración mientras se encontraba en el cuartel de la Policía y luego de haber recibido la lectura de sus derechos y adquirido inmunidad por parte del Ministerio Público.

En esta segunda declaración jurada se comienza relatando los mismos hechos expuestos en su primera declaración. La porción de su segunda declaración jurada que versa sobre lo expuesto en su primera declaración fue correspondientemente declarada inadmisible por el tribunal.

Sin embargo, en su segunda declaración jurada, Quiles Díaz relató hechos que no había mencionado en su primera declaración, pero que son altamente relevantes a los asesinatos bajo investigación. Al ser cuestionado en la segunda declaración jurada, Quiles Díaz declaró haber sido testigo ocular de los asesinatos cometidos y comentó que no se había atrevido a prestar tal información al Ministerio Público anteriormente por temor de represalias de Rodríguez Adames contra su vida y la de su familia. Esa porción del testimonio prestado por Quiles Díaz en su segunda declaración jurada, la cual relatamos a continuación, sí fue declarada admisible por el tribunal de instancia.

Según Quiles Díaz, Rodríguez Adames le había comunicado al coacusado Rodríguez Méndez la trampa cometida por O'Neill. El testigo indica que el 16 de diciembre de 1993 condujo a Rodríguez Adames en su carro a *Sammy's*

*Place,* donde esperó en el automóvil mientras Rodríguez Adames discutía con Rodríguez Méndez y O'Neill. Al regresar al carro, Rodríguez Adames le dijo al testigo que habían hablado con O'Neill y que todo se iba a resolver.

Posteriormente, el 28 de diciembre de 1993, Rodríguez Adames le pidió a Quiles Díaz que le condujera de nuevo a *Sammy's Place,* para allí encontrarse con los coacusados Rodríguez Méndez y Rodríguez Tirado y con las víctimas Javier O'Neill y Javier Torres Soto. Al llegar al establecimiento, Quiles Díaz reconoció el estacionado Toyota 1.6 azul claro, que él sabía pertenecía a Javier Torres Soto. Después de que el testigo permaneció solo en el automóvil por unos minutos, pudo ver a los cinco (5) salir del establecimiento. De ahí, el testigo condujo a Rodríguez Adames en su automóvil y los otros cuatro les siguieron en el Toyota. Rodríguez Adames le dijo al testigo que estuviera pendiente, pues cuando el automóvil ocupado por los imputados y las víctimas se detuviera, vería el asesinato.

Fue entonces que, según declara Quiles Díaz, luego de escuchar la bocina del otro carro, observó a los integrantes de éste desocuparlo y presenció el asesinato de O'Neill y Torres Soto a manos de Rodríguez Méndez y Rodríguez Tirado, respectivamente. Rodríguez Méndez y Rodríguez Tirado entonces se montaron en el carro que conducía el testigo, quien dejó a los imputados en el área de Las Cascadas. De ahí, el testigo continuó como chofer de Rodríguez Adames, quien le comentó al testigo cuatro (4) veces que debía guardar silencio sobre lo ocurrido, y que por eso le daría quinientos dólares ($500).

## VI

Es obvio que las declaraciones de estos testigos que fueron invalidadas como evidencia por el tribunal de instancia incumben expresiones orales que el Ministerio Público pre-

tende presentar para probar la verdad de lo aseverado. Según lo dispuesto por la Regla 60 de Evidencia, 32 L.P.R.A. Ap. IV, estas expresiones constituyen prueba referencia y son, por lo tanto, inadmisibles. Es sabido, sin embargo, que la presunción de inadmisibilidad de prueba de referencia es controvertible a través del uso de las excepciones dispuestas. Véase la Regla 61 de Evidencia, 32 L.P.R.A. Ap. IV.

El Ministerio Público encontró fundamento para la admisibilidad de estas declaraciones mediante la excepción esbozada en la Regla 64 de Evidencia, 32 L.P.R.A. Ap. IV. Esta regla permite la presentación de prueba bajo ciertos factores de necesidad y confiabilidad. *Pueblo v. Mendoza Lozada*, 120 D.P.R. 815, 825 (1988). En particular, la Regla 64(A) de Evidencia, *supra*, permite la admisión como evidencia de declaraciones de un testigo que no está disponible. Las disposiciones pertinentes de la Regla 64(A), *supra*, disponen de la manera siguiente:

*Regla 64. No disponibilidad del Testigo*
(A) Definición. "No disponibilidad como testigo" incluye situaciones en que el declarante:

. . . . . . . .

(4) ha fallecido o está imposibilitado de comparecer a declarar por razón de enfermedad o impedimento mental o físico, o
(5) *está ausente de la vista* y el proponente de su declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del tribunal. (Énfasis suplido.)

El alcance de esta regla incumbe únicamente ciertos tipos de declaraciones, entre las que se encuentran las declaraciones contra interés. Expone la Regla 64(B)(3):

(B) Cuando el declarante no está disponible como testigo, es admisible como excepción a la regla de prueba de referencia:

. . . . . . . .

(3) *Declaraciones contra interés*: Una declaración que al momento de ser hecha era tan contraria al interés pecuniario o propietario del declarante o le sometía al riesgo de responsabilidad civil o criminal, o tendía de tal modo a desvirtuar una

reclamación suya contra otro, o creaba tal riesgo de convertirlo en objeto de odio, ridículo o desgracia social en la comunidad, que un hombre razonable en su situación no hubiera hecho la declaración a menos que la creyera cierta. (Énfasis en el original.) 34 L.P.R.A. Ap. IV.

La premisa es que "[l]a garantía de confiabilidad radica ... en que de ordinario nadie hace una declaración que le sujete a algún tipo de perjuicio, a menos que tal aseveración sea cierta". *Pueblo v. Santiago Colón*, 125 D.P.R. 442, 462 (1990). Véanse: *Pueblo v. Mendoza Lozada*, supra, págs. 822–823; *Pueblo v. Mangual Hernández*, 111 D.P.R. 136, 143–144 (1981).

En *Pueblo v. Mendoza Lozada*, supra, pág. 824, establecimos tres (3) requisitos para la aplicación de la Regla evidenciaria 64(B)(3), *supra*:

Primeramente, la no disponibilidad del declarante; segundo, el conocimiento personal, exigencia que aunque no surge del texto de la regla es favorecida por el grueso de la doctrina. ... Por último, y como tercer requisito, la declaración, en efecto, debe ser contra interés.

Comparemos los hechos del caso de autos a los requisitos dispuestos en *Pueblo v. Mendoza Lozada*, supra, discutiéndolos en orden invertido para facilitar nuestro análisis.

Sobre el tercer requisito, nos parece obvio que las declaraciones de Javier O'Neill y Rodríguez Adames laboraban contra sus intereses. Estas declaraciones edificaban los elementos de delitos, que de ser imputados en su contra hubieran amenazado gravemente los intereses penales de estos declarantes. Las declaraciones de O'Neill relataron a los testigos el plan de que éste asesinara a Noemí Pagán y de su posterior decisión de robar una joyería. Por su parte, Rodríguez Adames le expresó a O'Neill su intención de contratarlo para que le diera muerte a Noemí Pagán; luego, Rodríguez Adames amenazó a O'Neill por no haber llevado a cabo la encomienda y haberse quedado con el dinero.

En cuanto al segundo requisito, los declarantes O'Neill

y Rodríguez Adames contaban con un conocimiento personal que les permitía entender la naturaleza autoperjudicial de sus expresiones. Recordemos que la doctrina de declaraciones contra interés "no exige conocimiento personal sobre todos y cada uno de los asuntos que dan lugar a una acusación criminal". *Pueblo v. Mendoza Lozada,* supra, pág. 826. Dada la gravedad de la sustancia de estas declaraciones, O'Neill y Rodríguez Adames ciertamente sabían y entendían la ilegalidad de los planes discutidos, por lo tanto tenían un entendimiento de que sus declaraciones podían afectar sus intereses penales.

En cuanto al primer requisito para aplicar la doctrina esbozada por la Regla 64(B)(3) de Evidencia, *supra* —el cual considera la disponibilidad de los declarantes— tenemos que Javier O'Neill yace muerto y, por lo tanto, de acuerdo con lo dispuesto en la Regla 64(A)(4) de Evidencia, 32 L.P.R.A. Ap. IV, se le hace imposible declarar. De esta manera, las declaraciones de Javier O'Neill, que serían presentadas por los testimonios impugnados, son admisibles, al éstas caer perfectamente dentro del ámbito dispuesto por este requisito para la aplicación de la Regla 64(B)(3) de Evidencia, *supra.*

Existe, sin embargo, confusión sobre la disponibilidad de Rodríguez Adames. A instancias del Ministerio Público, el Tribunal de Circuito de Apelaciones encontró que Rodríguez Adames "se evadió de la jurisdicción por lo que aún no se han presentado los cargos en su contra. Posteriormente fue arrestado en Filadelfia y se encuentra en espera de ser extraditado". Caso Núm. AC-95-19, Apéndice, pág. 6 esc. 2. Por otro lado, los recurrentes alegan en su último escrito que Rodríguez Adames ya se encuentra en nuestra jurisdicción y pendiente de que se comience juicio en su contra. Caso Núm. AC-95-20, Réplica al escrito en cumplimiento de orden, pág. 1. De ser así, la Regla 64(A) de Evidencia, *supra,* no es aplicable, pues no se cumple con el requisito de no disponibilidad. De ese ser el caso, los testimonios

impugnados que repitan declaraciones hechas por Rodríguez Adames serían prueba inadmisible.

Ante esa incertidumbre, remitimos al Tribunal de Primera Instancia la determinación de la disponibilidad de Rodríguez Adames para testificar en el juicio. De éste no estar disponible para los efectos de la Regla 64(A), *supra*, entendemos que la Regla 64(B)(3), *supra*, controla el resultado de la controversia, por lo que los testimonios sobre sus declaraciones deben ser admitidos.

## VII

En términos generales, expresamos en *Acosta v. Crespo*, 70 D .P.R. 239, 255 (1949):

La base de la excepción para declaraciones contra el interés procede de la calidad perjudicial de la declaración o del hecho expuesto que otorga a la declaración algún elemento de veracidad y compensa hasta cierto punto la ausencia del juramento y la oportunidad del contrainterrogatorio. *En consecuencia una declaración contra interés propio es admisible siempre que sea pertinente, no importa cuál sea la relación entre el declarante y la parte contra quien se ofrece.* (Énfasis en el original.)

Sin embargo, aunque la admisión de las declaraciones que serían repetidas por los testigos está fundamentada por la Regla 64(B)(3) de Evidencia, *supra*, el Tribunal de Circuito de Apelaciones sugiere en su sentencia que se requiere considerar su admisibilidad a la luz del efecto que éstas pueden tener sobre los intereses penales de Rodríguez Tirado y Rodríguez Méndez. Expresa ese tribunal:

... [L]a doctrina reconoce que cuando una declaración contra el interés penal, hecha por una persona no disponible como testigo, compromete a *otras* personas surge un problema constitucional que lesiona el derecho de confrontación .... Caso Núm. AC-95-20, Apéndice, pág. 51.

El Tribunal de Circuito está en lo incorrecto al inferir que esa doctrina es aplicable al caso de autos. Con el pro-

pósito de corregir ese error, examinemos la sustancia y alcance de esta norma doctrinal.

La doctrina a que el Tribunal de Circuito de Apelaciones hace referencia es de índole constitucional, concentrada en el derecho a la confrontación, al amparo del Art. II, Sec. 1 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, la Regla 40 de Evidencia, 32 L.P.R.A. Ap. IV, y la Sexta Enmienda de la Constitución de Estados Unidos. El caso rector sobre este asunto es *Lee v. Illinois*, 476 U.S. 530 (1986), en el cual el Tribunal Supremo federal determinó que la cláusula de confrontación requiere garantías de confiabilidad para que se admita como evidencia la confesión de un coacusado de asesinato para inculpar a otro. Véanse, también: *Williamson v. United States*, 512 U.S. 594 (1994); *New Mexico v. Earnest*, 477 U.S. 648 (1986); como referencia, *California v. Green*, 399 U.S. 149, 158 (1970); *Pointer v. Texas*, 380 U.S. 400 (1965); *Turner v. Louisiana*, 379 U.S. 466 (1965); *In re Oliver*, 333 U.S. 257 (1948); *Alford v. United States*, 282 U.S. 687 (1931); *Mattox v. United States*, 156 U.S. 237 (1895).

El postulado que justifica la presunción contra admisibilidad de este tipo de testimonio es explicado por el Tribunal Supremo federal de la forma siguiente:

> ... [The] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination ... "Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence". *Lee v. Illinois*, supra, pág. 541, citando a *Bruton v. United States*, 391 U.S. 123, 141 (1968), opinión disidente del Juez White. Véase, también, *Douglas v. Alabama*, 380 U.S. 415 (1965).

Persuasivamente, los tribunales federales, siguiendo la directriz general establecida en *Lee v. Illinios*, supra, han favorecido el requisito de demostración de confiabilidad. En *United States v. Alvarez*, 584 F.2d 694 (5to Cir. 1978), la

Corte Federal de Circuito de Apelaciones para el Quinto Circuito requirió garantías corroborativas que demostrasen un nivel de confiabilidad. El imputado en *United States v. Alvarez*, supra, había sido convicto de traficar heroína. En su juicio, se admitió en su contra las declaraciones de una persona ya fallecida. *United States v. Alvarez*, supra, pág. 695. Estas declaraciones fueron escuchadas por otra persona, quien testificó a favor del Gobierno, luego de haberse declarado culpable de los mismos cargos. Íd. Ese tribunal examinó el historial legislativo de la Regla 804(b)(3) Federal de Evidencia, 28 U.S.C. Ap., y revocó la admisión de las declaraciones, por entender que las expresiones inculpatorias hechas por el fallecido eran inadmisibles como declaraciones contra interés, salvo la presencia de garantías de confiabilidad. Íd., págs. 700–702. La norma dispuesta en *United States v. Alvarez*, supra, ha sido acogida por varios tribunales federales. Véanse: *U.S. v. Vernor*, 902 F.2d 1182 (5to Cir. 1990); *U.S. v. Garcia*, 897 F.2d 1413 (7mo Cir. 1990); *U.S. v. Seeley*, 892 F.2d 1 (1er Cir. 1989); *U.S. v. Koskerides*, 877 F.2d 1129 (2do Cir. 1989); *U.S. v. Roberts*, 844 F.2d 537 (8vo Cir. 1988); *U.S. v. Fields*, 871 F.2d 188 (1er Cir. 1989); *U.S. v. Layton*, 855 F.2d 1388 (9no Cir. 1988); *United States v. Palumbo*, 639 F.2d 123 (3er Cir.), *cert.* denegado, 454 U.S. 819 (1981); H. Ishola, *Of Confrontation: The Right Not to Be Convicted on the Hearsay Declarations of an Accomplice*, 1990 Utah L. Rev. 855, 885 (1990).

Reconociendo la sabiduría del postulado, seguimos lo dispuesto en *Lee v. Illinois*, supra, al restringir en *Pueblo v. De Jesús Ayuso*, 119 D.P.R. 21, 35 (1987), la admisibilidad de declaraciones contra interés prestadas por un coautor para inculpar a otro, delineando el requisito de confiabilidad que debe ser requerido. En *Pueblo v. De Jesús Ayuso*, supra, dictamos la norma de derecho aplicable mediante el uso de la siguiente frase del Prof. Bernard S. Jefferson:

... [C]uando la declaración contra el interés penal hecha por

una persona compromete a *otras* personas surge un problema constitucional cuando algunas de esas personas resulta acusada y se pretende utilizar la declaración contra ésta, no estando disponible como testigo el declarante, puede resultar lesionado el derecho constitucional que tiene el imputado de delito a "confrontarse" con los testigos en su contra. (Énfasis en el original.) *Pueblo v. De Jesús Ayuso*, supra, pág. 35. Véase B.S. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule*, 58 Harv. L. Rev. 1, 35 (1944).

En esa decisión expusimos que en la situación en que un coautor expone declaraciones contra interés, prestadas previamente por otra persona acusada de haber cometido el delito, el testimonio queda sujeto a una presunción de no confiabilidad, y, por lo tanto, no es admisible. *Pueblo v. De Jesús Ayuso*, supra, pág. 36. Véase, también, *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991). Determinamos también que esa presunción es controvertible:

... [U]na confesión prestada por un coautor, que no está disponible como testigo, se presume no confiable cuando se ofrece en el juicio contra otro acusado a quien inculpa, resultando inadmisible la misma a menos que el Ministerio Público demuestre que, *bajo las circunstancias especiales del caso*, existían elementos de confiabilidad o corroboración que justifican que la misma sea admitida en evidencia .... (Énfasis suplido.) *Pueblo v. De Jesús Ayuso*, supra, pág. 36. Véanse: *Lee v. Illinois*, supra, pág. 543; *Ohio v. Roberts*, supra.

La doctrina expuesta se desarrolló para proteger a coacusados de los testimonios incriminantes de otros acusados, quienes pueden tener como su razón de declarar, no la verdad requerida por su juramento, sino la intención de arrojar el peso de la culpa para no tener que cargarlo. El caso de autos no se presta a la aplicación tradicional de esa doctrina. Nótese que Rodríguez Adames no ha sido acusado como coautor de los asesinatos de O'Neill y Torres Soto en este proceso judicial. Tampoco se tiene una confesión de Rodríguez Adames que inculpe a los imputados Rodríguez Tirado y Rodríguez Méndez. La situación ante nos no tiene que ver con un coautor que presente declaraciones contra

interés para imputarle culpabilidad a otro; Javier O'Neill yace asesinado y Rodríguez Adames pronunció sus declaraciones contra interés antes de que la fase investigativa comenzara sobre estos hechos. Por las razones expuestas, entendemos que la doctrina no es aplicable a situaciones como la del caso de autos, en que los declarantes de las expresiones contra interés no han sido aún acusados como coautores de los delitos a ser juzgados.

El peso persuasivo de la Regla 804(b)(3) Federal de Evidencia, *supra*, confirma que la doctrina aludida no es aplicable al caso de autos. La Regla 804(b)(3), *supra*, rige la admisibilidad de declaraciones contra interés. Ésta es explícita en señalar las situaciones en que se requiere una garantía de confiabilidad adicional para sostener la admisibilidad de la declaración. Dispone la Regla 804(b)(3) Federal de Evidencia, *supra*:

> (b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . . . . . .
>
> (3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.* (Énfasis suplido.)

La Regla 804(b)(3), *supra*, requiere una garantía de confiabilidad adicional, de índole corroborativa, sólo en situaciones en que la declaración contra interés tiende a inculpar *al declarante* y a *exculpar al acusado.* La regla es clara en no cubrir el patrón de hechos que nos ocupa, en el cual el Ministerio Público persigue la admisibilidad de las declaraciones contra interés para *inculpar a los acusados.*

Habiendo dispuesto que la doctrina de garantía de con-

fiabilidad no es aplicable al caso de autos, de todos modos concluimos, al examinar las declaraciones en cuestión, que existen tales elementos de confiabilidad.([4]) Cada uno de los testigos impugnados ofrece una pieza del mosaico que son los sucesos y detalles de los crímenes que están siendo adjudicados ante el tribunal de instancia. Las declaraciones de éstos son consistentes en su recuento, dando diferentes porciones de la misma historia. Según el Ministerio Público, lo acontecido que llevó a la muerte de O'Neill y Torres Soto sólo puede ser entendido, en su contexto correcto, por medio de la consideración conjunta de los testimonios de estos tres testigos.

Por otro lado, el expediente no establece una relación sospechosa entre los testigos ni la presencia de un interés común entre éstos que les llevaría a mentir. Luis Vargas Lisojo y Moisés Rivera Padua eran amigos de la difunta víctima Javier O'Neill, mientras que Edwin Quiles Díaz era empleado y confidente de Rodríguez Adames en su mueblería. Como bien menciona la sentencia emitida por el Tribunal de Circuito de Apelaciones, el expediente no demuestra indicio de que los declarantes mentían en sus expresiones. Quiles Díaz hasta prestó su declaración bajo el amparo de inmunidad concedida por el Ministerio

---

([4]) Aun si la doctrina de garantía de confiabilidad fuese aplicable al caso de autos, entendemos que el hecho de que las declaraciones sean admisibles al amparo de la Regla Evidencia 64(B)(3) de Evidencia, 32 L.P.R.A. Ap. IV, asiste a su admisibilidad. En *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), el Tribunal Supremo federal expuso la prueba que desfilaría para determinar la admisibilidad del testimonio de un coacusado contra otro, a los fines de garantizar el derecho a la confrontación. Ese Tribunal dictaminó la admisibilidad de un testimonio fundamentado en una excepción a la regla de prueba de referencia, como lo es el caso de autos. Pronunció ese Tribunal:

"... [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' *Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.* In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (Énfasis suplido.) *Ohio v. Roberts*, supra, pág. 66. Véanse, también: *Bourjaily v. United States*, 483 U.S. 171 (1987); H. Ishola, *Of Confrontation: The Right Not to Be Convicted on the Hearsay Declarations of an Accomplice*, 1990 Utah L. Rev. 855, 872–873 (1990).

Público. Por estas razones, es nuestro criterio que las declaraciones impugnadas cuentan con garantías de confiabilidad que sostienen su admisibilidad como evidencia.

## VIII

Aparte de que los testimonios inadmitidos constituyen prueba de referencia, el tribunal de instancia entendió que los testimonios impugnados perseguían la inflamación del Jurado sobre la acusación de conspiración, la cual fue asignada para ser ventilada por un procedimiento jurídico independiente al de autos. Ante esto, actuó correctamente el Tribunal de Circuito de Apelaciones al entender que esa prueba cuenta con capacidad para ser admitida, según lo dispuesto por la Regla 20(B) de Evidencia, 32 L.P.R.A. Ap. IV.

> Aunque evidencia de la comisión de otros delitos, daño civil u otros actos no es admisible para probar el carácter de una persona, con miras a demostrar que actuó de conformidad con tal carácter, *dicha evidencia es admisible si es pertinente para otros propósitos, tales como prueba de motivo,* oportunidad, intención, preparación, plan, conocimiento, identidad o ausencia de error o accidente. (Énfasis suplido.)

En cuanto a la aplicación de esta regla evidenciaria sobre las declaraciones que nos ocupan, cuando éstas son primariamente pertinentes a un delito que se ventila en un procedimiento independiente, en *Pueblo v. García Reyes,* 113 D.P.R. 843, 855–856 (1983), aclaramos que:

> ... [La] evidencia de otros delitos cometidos por el acusado no es admisible en un proceso criminal, *excepto cuando el delito anterior ... (c) puede demostrar motivo,* intención, premeditación, malicia o un designo común .... (Énfasis suplido.)

Como planteó el Ministerio Público ante el foro de instancia, se interesa presentar los testimonios objetados como prueba de motivo, al amparo de los preceptos expuestos anteriormente. Las declaraciones establecen el motivo

que llevó a Rodríguez Adames a ordenar la muerte de O'Neill. Considerando el alto grado de prueba que requiere la convicción de los acusados, entendemos que procede en derecho la aplicación de la Regla 20(B) de Evidencia, *supra*, a los testimonios que nos ocupan.

> Cierto es que probar la motivación no es indispensable para una condena, pero es igualmente cierto que si el Estado prueba tal motivación ello constituye un ... factor importante cuando se produce una condena a base de evidencia circunstancial, el que exista un motivo comprobado para el crimen, tal como el lucro, la venganza o la cólera producida por una riña. *Pueblo v. Ortiz Rodríguez*, 100 D.P.R. 972, 981–982 (1972).

## IX

Discutidos los méritos de los fundamentos evidenciarios comunes a los tres (3) testimonios, nos resta disponer de ciertas controversias individuales a la admisibilidad de cada una de éstas.

El tribunal de instancia declaró inadmisible el testimonio de Vargas Lisojo no relacionado con lo que presenció durante los asesinatos. No obstante, la Regla 66 de Evidencia, 32 L.P.R.A. Ap. IV, permite la admisibilidad de las expresiones de Vargas Lisojo sobre lo que Rodríguez Adames le dijo a O'Neill. En cuanto a esto nos encontramos con un problema de prueba de referencia múltiple, sobre el cual la Regla 66, *supra*, dispone que:

> Es admisible prueba de referencia que contiene a su vez prueba de referencia si tanto la prueba de referencia principal como la subordinada o incluida caen en el ámbito de alguna excepción a la regla de prueba de referencia. Véase, también, *Pueblo v. Nazario Hernández*, 138 D.P.R. 760 (1995).

Por las razones analizadas anteriormente, Rodríguez Adames ciertamente actuaba contra su interés penal al hacerle las aludidas declaraciones a O'Neill, por lo que, presumiendo que éste no está disponible —y siguiendo la cadena de excepciones a la regla de prueba de referencia— la

declaración de Vargas Lisojo sobre lo que le dijo O'Neill de esa conversación es prueba admisible.

## X

Sobre las manifestaciones que Moisés Rivera Padua escuchó al coacusado Edgard Rodríguez Méndez hacerle a O'Neill, de que se atuviera a las consecuencias de no completar su encomienda o devolver el dinero tomado por ésta, basta con identificarlas como admisiones de parte. Según lo dispuesto por la Regla 62(A) de Evidencia, 32 L.P.R.A. Ap. IV, es una excepción a la regla de prueba de referencia. Expone la Regla 62(A) de Evidencia, *supra*:

> *Regla 62. Admisiones*
> Es admisible como excepción a la regla de prueba de referencia una declaración ofrecida contra una parte si la declaración:
> (A) Es hecha por dicha parte, bien en su capacidad individual o representativa ....

Existen, pues, dos (2) requisitos para la aplicación de la Regla: (1) que la declaración haya sido hecha por la parte; (2) que la declaración se ofrezca precisamente contra la parte que la hizo. Véase *F.D.I.C. v. Caribbean Mktg. Ins. Agency*, 123 D.P.R. 247, 258–259 (1989). Rodríguez Méndez tiene el *status* de acusado en la acción criminal de la cual proviene el presente recurso. No es necesario pronunciarnos más a fondo al respecto.

## XI

El tribunal de instancia encontró inadmisible parte de la exposición de Edwin Quiles Días, por razón de que a ese testigo no se le hicieron las advertencias legales necesarias antes de prestar sus declaraciones juradas. Esa conclusión también carece de fundamentos jurídicos.

La defensa no tiene *standing* para impugnar la admisibilidad de las declaraciones vertidas por Quiles Díaz. La

doctrina controlante estipula que sólo una parte cuyos derechos de debido proceso hayan sido violados tiene capacidad para atacar la admisibilidad de testimonio presentado, por razón de haber sido prestado sin haberse recibido las advertencias requeridas. *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287, 304 (1988); E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. 1, pág. 111. Los derechos de debido proceso de los imputados Rodríguez Tirado y Rodríguez Méndez no han sido impactados de esta manera, por lo que carecen de *standing* para impugnar el testimonio de Quiles Díaz.

Aun si asumiéramos, *arguyendo*, que la defensa tenía *standing* para atacar la admisibilidad de las declaraciones juramentadas por Quiles Díaz, por éstas violar los derechos de no autoincriminación, esa doctrina constitucional no haría estas declaraciones inadmisibles. Es sabido que el privilegio a la no autoincriminación durante una investigación criminal se activa sólo cuando el interrogado se considera un sospechoso de haber cometido el delito bajo investigación, y se le cuestiona bajo custodia. Véanse: *Miranda v. Arizona*, 384 U.S. 436 (1966); *Pueblo en interés menor J.A.B.C.*, 123 D.P.R. 551 (1989); *Pueblo v. Chaar Cacho*, 109 D.P.R. 316 (1980); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965).

Al prestar su primera declaración jurada, Edwin Quiles Díaz no era entrevistado como sospechoso de haber cometido los delitos investigados ni se encontraba bajo custodia o coerción. Por lo tanto, simplemente, no se requerían las advertencias aludidas.[5] Véanse, también: *Pueblo v. Chaar*

---

[5] Aún bajo la impresión de que Quiles Díaz se entrevistaba como posible coautor, el testimonio de éste sería admisible. Fuese ese el caso, la norma de derecho sería la aplicada a situaciones en las cuales la

"... admisión [fue dada voluntariamente] pero sin las advertencias, seguida de admisión posterior tras las advertencias de rigor —el criterio rector para determinar la admisibilidad de la última admisión es el de la voluntariedad." E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, pág. 103. Véase, también, *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287 (1988).

*Cacho,* supra, pág. 324; *Chiesa, op. cit.,* págs.. 84–89 y 90–92.

En cuanto a su segunda declaración, la cual Quiles Díaz juramentó el 15 de enero de 1994, éste recibió las correspondientes advertencias. En esa ocasión, el Ministerio Público le concedió hasta inmunidad. Sabemos, por lo tanto, que el testigo prestó su segunda declaración jurada de manera voluntaria y libre de coerción.

Por los fundamentos expuestos, estamos conforme con la sentencia que hoy emite este Tribunal. Procede confirmar la sentencia emitida por el Tribunal de Circuito de Apelaciones en cuanto a la admisibilidad de los testimonios de Moisés Rivera Padua, Ángel Luis Vargas Lisojo y Edwin Quiles Díaz sobre las declaraciones hechas por Javier O'Neill, a base de lo dispuesto por la Regla 64(B)(3) de Evidencia, *supra.* En cuanto a los testimonios de los testigos Moisés Rivera Padua, Ángel Luis Vargas Lisojo y Edwin Quiles Díaz sobre las declaraciones que hiciera Generoso Rodríguez Adames ("Palilo"), el tribunal de instancia debe admitirlos de éste no estar disponible para declarar según dicha regla.

