Miranda De Hostos, Juez Ponente
*974 TEXTO COMPLETO DE LA SENTENCIA
Con el propósito de que los recursos ante nuestra consideración se tramitaran de una manera rápida y eficaz, ordenamos la consolidación de los recursos KLAN-1999-00513, KLAN-1999-00627 y KLAN-1999-00663, mediante resolución de 25 de abril de 2000.
Las partes apelantes nos solicitan que revoquemos una sentencia del Tribunal de Primera Instancia, Sala Superior de Carolina, que los declaró culpables a los apelantes por asesinato en primer grado, secuestro, conspiración y violación a la Ley de Armas.
Se confirman las sentencias apeladas.
Veamos los fundamentos.
I
Los hechos que dan origen al presente recurso ocurrieron el 1 de abril de 1998. Según el testimonio de Julio Osorio Pérez, quien participó en los eventos y se le concedió el beneficio de inmunidad, en esa fecha éste acudió con el apelante Cruz Robles Calderón conocido como “Miniman” a las oficinas de sus respectivos abogados. El abogado de Julio Osorio Pérez era el licenciado Falú, y el abogado del apelante Cruz Robles Calderón era el licenciado Juan Gregorio Bemal, ambos con oficinas contiguas en Carolina. Julio Osorio Pérez acudió a donde su abogado, pues éste lo estaba representando en dos (2) casos de asesinato, un hurto de carro y una ley de armas. (T.E. Juicio II, págs. 18-21,177-178.)
Cuando Julio Osorio Pérez estaba en las oficinas del licenciado Falú, éste le informó que había unas órdenes de arresto en contra de ellos y cuando llamaron al CIC de Carolina, le comunicaron que sólo eran contra Cruz Robles Calderón y “Pillín”. Julio Osorio Pérez estuvo en las oficinas del licenciado Falú como media hora, donde éste le informó que el testigo que estaba declarando en su contra era Daniel Hernández Osorio. Según el testimonio de Julio Osorio Pérez, el licenciado Falú le indicó que había que matar a ese testigo, pero él no le dijo a nadie sobre esta conversación. Posteriormente, Julio Osorio Pérez, Cruz Robles Calderón y “Pillín”, acudieron al tribunal donde fiaron a los acusados, luego fueron al CIC y finalmente se fueron para la casa de Julio Osorio Pérez. (T.E. Juicio II, págs. 22-24, 147-150, 241-244, 249-250, 364-365, 370-371.)
Alrededor de las 10:30 pm, cuando Julio Osorio Pérez se encontraba en su casa con el apelante Miguel *975 Cirino Calderón conocido como “Pegue” y con “Eli”, llegaron el apelante Cruz Robles Calderón, el apelante Luis Rivera González conocido como “Saúl”, “Papito”, “Tato” y “Pusulo”. Estos llegaron en un Pontiac color verde cuatro puertas y un Kia color vino cuatro puertas. Ambos vehículos le pertenecían al apelante Cruz Robles Calderón. (T.E. Juicio II, págs. 25-26, 257-259.)
Mientras se encontraban en la planta de arriba de la casa de la mamá de Julio Osorio Pérez, donde éste residía, el apelante Cruz Robles Calderón les informó que su abogado, el licenciado Falú, le había dicho que “el testigo estrella del caso era Danny y que había que matarlo”. Cruz Robles Calderón estaba siendo acusado por el asesinato de “Pee” y otra persona. (T.E. Juicio II, págs. 26-28,147, 251-252, 372.)
Posteriormente, bajaron a la escalera y al balcón de la casa de la hermana de Julio Osorio Pérez en la parte de atrás, donde el apelante Cruz Robles Calderón le ordenó a “Papito” que como a las 11:00 pm fuera a buscar a Daniel Hernández Osorio y le dijera que se iba a hacer una “brega” de unos kilos en el puente Herrera con el propósito de “pescarlo” para que fuera al lugar. Cruz Robles Calderón le dijo a “Papito” que lo llevara al puente Herrera, que allí lo iban a estar esperando los apelantes Miguel Cirino Calderón y Luis Rivera González para secuestrarlo. (T.E. Juicio II, págs. 27-29, 36, 86,184, 276, 354, 366-367, 373.)
De acuerdo al testimonio de Julio Pérez Osorio, se envió a “Papito” a buscar a Daniel Hernández Osorio porque era el que más confianza tenía con él, pues “huellan perico juntos”. El plan era que una vez “Papito” trajera a Daniel Hernández Osorio al puente Herrera, luego los apelantes Luis Rivera González y Miguel Cirino Calderón le iban a dar un batazo en la cabeza para montarlo en el baúl del carro, secuestrarlo y llevarlo a El Verde para matarlo. Una vez llegaran a El Verde, el apelante Luis Rivera González iba a matarlo con un Mágnum .357. (T.E. Juicio II, págs. 28-32, 36-37, 87-90,141-143, 252-253, 282-285, 363.)
“Papito” salió como a las 10:30 pm a buscar a Daniel Hernández Osorio en Villa Santos y no lo encontró, por lo que regresó a buscarlo y lo encontró en Las Carreras. Los demás se quedaron esperando que pasaran para verlos llegar al puente Herrera. Poco antes de las 11:00 pm, antes de que éstos llegaran al puente Herrera, los apelantes Luis Rivera González y Miguel Cirino Calderón se habían ido para el puente en el Pontiac color verde cuatro (4) puertas. Como a las 11:00 pm pasaron en bicicleta “Papito”, Daniel Hernández Osorio y Víctor Colón Ayala. Posteriormente, como diez (10) o quince (15) minutos después, Julio Pérez Osorio, “Pusulo” y el apelante Cruz Robles Calderón, se montaron en el Kia color vino cuatro (4) puertas y se fueron para la parte de arriba del puente Herrera a esperar que los apelantes Luis Rivera González y Miguel Cirino Calderón subieran con Daniel Hernández Osorio. (T.E. Juicio II, págs. 35-38, 99-102, 163, 187-194, 261-263, 268-275, 312, 365, 373-374.)
Luego de que “Papito” y los apelantes Luis Rivera González y Miguel Cirino Calderón subieron del puente Herrera en el Pontiac con Daniel Hernández Osorio en el baúl del carro y Víctor Colón Ayala en el interior del carro, el apelante Cruz Robles Calderón y Julio Osorio Pérez los siguieron en el Kia para dirigirse hasta El Verde donde iban a matar a Daniel Hernández Osorio. Mientras se dirigían hacia Río Grande, Daniel Hernández Osorio se tiró del baúl del Pontiac y trató de correr hacia un palmar, por lo que tuvieron que detenerse ambos vehículos. El apelante Luis Rivera González se bajó del carro para alcanzarlo y cuando lo agarró, lo metió en el asiento de atrás del Pontiac. (T.E. Juicio II, págs. 40-42, 194-201, 290-292, 301-304, 374-375.)
Una vez montaron nuevamente a Daniel Hernández Osorio en el Pontiac, continuaron su viaje a El Verde hacia un sector donde hay un puente que tiene un río con muy poco alumbrado. Cuando llegaron los dos (2) vehículos, el Pontiac y el Kia, al puente en El Verde, el apelante Luis Rivera González se bajó del Pontiac y bajó a Daniel Hernández Osorio. Al bajarse del carro, el apelante Luis Rivera González le informó al apelante Cruz Robles Calderón y a Julio Osorio Pérez que Víctor Colón Ayala se había escapado. Luego, el apelante Luis Rivera González bajó a Daniel Hernández Osorio por el puente y le hizo varios disparos con el Mágnum en la cabeza. Según el testimonio de Julio Osorio Pérez, se escucharon seis (6) detonaciones. Acto seguido, *976 como seis (6) o siete (7) segundos después, subió el apelante Luis Rivera González, se montó en el Pontiac y se fueron ambos vehículos para la casa de Julio Osorio Pérez. (T.E. Juicio II, págs. 42-46, 73-74, 150-151, 203-208, 294, 326, 365, 375.)
Cuando regresaron todos a la casa de Julio Osorio Pérez, encontraron a Víctor Colón Ayala en la parte de atrás de la casa con “Tato” y “Eli”. Estos últimos les dijeron que cuando vieron pasar a Víctor Colón Ayala lo vieron sospechoso, por lo que lo encañonaron y lo aguantaron en la parte de atrás de la casa, en donde estaba la casa de la hermana de Julio Osorio Pérez. El apelante Cruz Robles Calderón decidió que había que matarlo también porque éste estaba diciendo los apodos de todos sin conocerlos y porque acababan de matar a un testigo y el apelante Cruz Robles Calderón no quería dejar otro testigo vivo. Víctor Colón Ayala les dijo que no lo matara, que lo dejaran ir porque él iba a hablar con su madre para que le sacara un pasaje y lo mandara para afuera. Mientras ocurría esto, estaban presentes Julio Osorio Pérez, “Tato”, “Eli”, “Papito”, “Pusulo”, “Oscar”, “Alex” y los apelantes Luis Rivera González y Miguel Cirino Calderón. (T.E. Juicio II, págs. 46-52, 168, 208-211, 314-320, 368, 375.)
Una vez el apelante Cruz Robles Calderón dio la orden de matar a Víctor Colón Ayala, Julio Osorio Pérez llevó a Víctor Colón Ayala por las manos hacia el vehículo Kia y le dijeron que lo iban a llevar a donde su madre. Cuando iban llevándolo al Kia, Víctor Colón Ayala trató de escaparse y Julio Osorio Pérez lo agarró otra vez y lo llevó al asiento de atrás del Kia donde ya estaban montados el apelante Cruz Robles Calderón y “Pusulo”. Luego, por órdenes del apelante Cruz Robles Calderón, se dirigieron a Villa Pesquera en Río Grande por la carretera vieja de Río Grande. (T.E. Juicio II, págs. 53-54, 319-322.)
Llegaron a Villa Pesquera como a las 12:00am y fueron a un lugar muy oscuro donde no había ninguna vivienda, sólo estaba la carretera, grama y una cerca con palos y alambres de púa. Cuando se estacionaron, Julio Osorio Pérez tuvo que hacer fuerza para sacar a Víctor Colón Ayala del vehículo; éste trató de correr, pero el apelante Cruz Robles Calderón con una pistola 9mm y “Pusulo” con una Glock 9mm, estaban esperándolo afuera y comenzaron a dispararle mientras Julio Osorio Pérez observaba todo desde la parte de atrás del Kia. Una vez Víctor Colón Ayala cayó a la grama boca arriba, el apelante Cruz Robles Calderón y “Pusulo” se montaron en el carro y se fueron para la casa de Julio Osorio Pérez. (T.E. Juicio II, págs. 55-59, 317-320, 323, 326-327, 376-377.)
Cuando regresaron nuevamente a la casa de Julio Osorio Pérez, todos los demás estaban esperándolos allí. El apelante Cruz Robles Calderón mandó a buscar las bicicletas que había dejado en el puente Herrera. Según el testimonio de Julio Osorio Pérez, el apelante Luis Rivera González, antes de irse, le dijo que había tenido que darle varios pistolazos con el revolver a Daniel Hernández Osorio en la cabeza porque lo había hecho ensuciarse las botas. (T.E. Juicio II, págs. 59-60,143-144, 327-328, 363.)
Posterior al 1 de abril de 1998, día en que ocurrieron los hechos, Julio Pérez Osorio usó el Pontiac color verde cuatro puertas del apelante Cruz Robles Calderón, para ir a una gallera en Mameyes. Cuando regresó de la gallera, unos policías llegaron a su casa buscando a una persona con el nombre de Félix que alegadamente éste estaba escondiendo, pero como rebuscaron la casa y no encontraron nada, se fueron. Al día siguiente, fueron nuevamente a la casa de Julio Osorio Pérez y ocuparon el Pontiac cuando éste no se encontraba en su casa. (T.E. Juicio II, págs. 60-62, 111-113, 116, 277-279, 329-330, 333-336.)
Julio Osorio Pérez le había pedido prestado el Pontiac al apelante Cruz Robles Calderón quien lo tenía escondido, pero cuando regresó de la gallera, no lo llevó a donde estaba escondido. El apelante Cruz Robles Calderón tenía el Pontiac escondido, pues aparecía como robado porque alegadamente se lo había vendido la prima de “Perico” y luego lo reportó robado. Cuando ocuparon el vehículo Pontiac, éste todavía tenía manchas de sangre, aunque el apelante Cruz Robles Calderón lo había mandado a limpiar. (T.E. Juicio II, págs. 60-62, 111-113, 116, 277-279, 329-330, 333-336.)
*977 Posteriormente, el mismo día en que la policía ocupó el Pontiac, el agente Yamil Pérez fue nuevamente a la casa y arrestó a Julio Osorio Pérez por tener el carro robado en su posesión. Al momento de ser arrestado, Julio Osorio Pérez le informó al agente que el Pontiac no era suyo, sino del apelante Cruz Robles Calderón. Julio Osorio Pérez estuvo arrestado como dos (2) o tres (3) semanas hasta que fue puesto en libertad, pues el apelante Cruz Robles Calderón pagó la fianza de $150,000.00 que se le había impuesto. Luego de salir de la cárcel, Julio Osorio Pérez estuvo como dos (2) semanas en Loíza, y posteriormente, los agentes lo sacaron para llevarlo al albergue de testigos. (T.E. Juicio II, págs. 62-65, 107-108, 331-332, 337-339.)
Mientras se encontraba en la cárcel, Julio Osorio Pérez conversó con el agente Yamil Pérez y este último lo convenció de que declarara en contra del apelante Cruz Robles Calderón, pues le dijo que tenía que cambiar su vida y que el apelante Cruz Robles Calderón lo había dejado “arrollad” porque no lo había sacado de la cárcel. Además, lo convenció porque iba a tener protección una vez declarara, por lo que Julio Osorio Pérez hizo una declaración con el agente Iván Malavé. (T.E. Juicio II, págs. 65-70, 109, 123-124, 165, 336-337, 340-341.)
Julio Osorio Pérez prestó dos (2) declaraciones ante el agente Iván Malavé, una mientras se encontraba en la cárcel el 13 de mayo de 1998 y la segunda el 26 de mayo de 1998, cuando estaba en el albergue de protección de testigos. Durante la primera declaración, Julio Osorio Pérez no estuvo acompañado por ninguna representación legal, pues el agente Iván Malavé le ofreció conseguirle uno y éste no quería ningún abogado. La segunda declaración se tomó con el propósito de aclarar cuáles eran las pistolas que tenían los acusados el día de los hechos e identificarlas. Julio Osorio Pérez realizó un convenio de inmunidad con el Departamento de Justicia en el cual se pactó que a cambio de prestar la declaración, a éste se le archivaron unos casos de Ley de Armas y el del robo del Pontiac. Además, se pactó que éste declararía en cinco (5) casos de asesinato contando el presente. (T.E. Juicio II, págs. 65-70, 75-81, 88, 98,109, 124-125, 172-173, 264-268, 348-350.)
El arma con la cual Luis Rivera González le disparó a Daniel Hernández Osorio fue ocupada posteriormente a una persona conocida como “Huma”. Esta arma le pertenecía al apelante Cruz Robles Calderón desde aproximadamente un (1) año anterior a los hechos cuando se la compró a un “tecato” en presencia de Julio Osorio Pérez. (T.E. juicio II, págs. 71-73.)
El Ministerio Público presentó a la investigadora forense, la señora Marisol Rodríguez, que investigó la escena del asesinato de Víctor Colón Ayala y declaró que en ésta encontró un (1) fragmento de blindaje de proyectil de bala disparado y cuatro (4) casquillos de bala disparados calibre 9mm. Además, declaró que dicha evidencia fue entregada al Laboratorio del Instituto de Ciencias Forenses al área de balística donde se le asignó el número AF98-530. Marisol Rodríguez solicitó que se le realizara a la evidencia una comparación microscópica para determinar si había disparado una o más armas de fuego. (T.E. Juicio I, págs. 380-439.)
Además, se presentó el testimonio de la patóloga forense, la doctora María Conte Rivera, que realizó la autopsia del cuerpo de Víctor Colón Ayala. Esta declaró que en la autopsia encontró un total de siete (7) heridas con sus entradas y salidas. Sin embargo, no encontró en el cuerpo ningún proyectil o blindaje porque todas las balas entraron y salieron. (T.E. Juicio II, págs. 130-380; T.E. Juicio III, págs. 5-23.)
El Ministerio Público presentó a la patóloga forense la doctora, Yocasta Brugal Mena, y del especialista en armas de fuego, el señor Juan B. Maldonado. La doctora Brugal Mena fue quien realizó la autopsia del occiso Daniel Hernández Osorio y declaró que el cuerpo de Daniel Hernández Osorio tenía laceraciones y contusiones que pudieron haber sido ocasionados por un bate, una culata de revólver o un tubo. Además, tenía seis (6) heridas de bala que perforaron los órganos internos y le ocasionaron la muerte. Durante la autopsia, se recuperaron cinco (5) proyectiles y un fragmento. (T.E. Juicio III, págs. 29-69.)
En relación al caso AF98-696 sobre el asesinato de Daniel Hernández Osorio, el señor Juan B. Maldonado, especialista en armas de fuego, examinó un revólver marca “Smith & Wesson” calibre .357 modelo 66-1 y seis (6) balas sin disparar calibre .357. Además, llevó a cabo una comparación microscópica con la autopsia Al 188- *978 98 que correspondía al occiso Daniel Hernández Osorio y un estudio pericial que consiste en determinar el funcionamiento del arma sospechosa. Efectuó una comparación microscópica entre un proyectil que se disparó del revólver sospechoso en un disparo de prueba y lo comparó microscópicamente con la evidencia recuperada de la autopsia de Daniel Hernández Osorio. Según el testimonio del señor Juan B. Maldonado, el estudio pericial reveló que el revólver sospechoso disparó cuatro (4) proyectiles y el blindaje de proyectil de bala que se recuperaron en la autopsia de Daniel Hernández Osorio. (T.E. Juicio III, págs. 57-66.)
Finalmente, el señor Juan B. Maldonado declaró que el caso número AF98-530 consiste de un blindaje de proyectil de bala disparada deformada y cuatro (4) casquillos de bala disparados calibre 9mm sometidos por la investigadora forense Marisol Rodríguez, y que de acuerdo a su análisis, los primeros tres (3) casquillos fueron disparados por la misma pistola 9mm y el cuarto (4) casquillo fue disparado por otra pistola también 9mm. Por lo tanto, concluyó que de acuerdo a la evidencia examinada en el caso número AF98-530 referente a la evidencia ocupada en la escena del asesinato de Víctor Colón Ayala, se habían utilizado dos (2) pistolas calibre 9mm. (T.E. Juicio III, págs. 92-99.)
Sometidos los casos y cumplido el trámite procesal, el jurado rindió su veredicto. Contra el apelante Miguel Cirino Calderón conocido como “Peque”, el jurado lo declaró culpable por los delitos de secuestro y conspiración, y no culpable por el delito de asesinato en primer grado e infracción a los Arts. 6, 6(a) y 8 de la Ley de Armas. Contra el apelante Luis Rivera González conocido como “Saúl”, el jurado lo declaró culpable por los delitos secuestro y conspiración, y no culpable por el delito de asesinato en primer grado e infracción a los Arts. 6, 6(a) y 8 de la Ley de Armas. Contra el apelante Cruz Robles Calderón conocido como “Minimarí’, el jurado lo declaró culpable del delito de asesinato en primer grado de Víctor Colón Ayala, secuestro, conspiración e infracción a los Arts. 6 y 8 de la Ley de Armas, y no culpable por asesinato en primer grado de Daniel Hernández Osorio, e infracción a los Arts. 6 y 8 de la Ley de Armas. (T.E. Instrucciones al Jurado y Veredicto, págs. 21-100.)
Así las cosas, el 23 de abril de 1999, el tribunal de instancia dictó sentencias condenatorias y consecutivas contra los apelantes. Inconformes con dichas determinaciones, los apelantes acuden ante nos.
Expuestos los hechos pertinentes a la controversia ante nuestra consideración, procedemos a analizar cada apelación por separado, discutiendo la norma jurídica aplicable y su aplicación a los hechos.
II
Recursos KLAN-1999-00513 y KLAN-1999-00663, de los apelantes Cruz Robles Calderón y Luis Rivera González
En los recursos KLAN-1999-00513 y KLAN-1999-00663, los apelantes Cruz Robles Calderón y Luis Rivera González alegan, en síntesis, que incidió el tribunal de instancia al: primero, denegar la moción de recusación general del panel de jurados y al denegar tres (3) recusaciones motivadas durante el proceso de desinsaculación del jurado; segundo, denegar la moción urgente solicitando transferencia de vista presentada por la representación legal del apelante Cruz Robles Calderón, el licenciado Colón, debido al conflicto de señalamientos entre el presente caso y uno de triple asesinato en el Centro Judicial de Humacao y al imponer un itinerario de trabajo extenuante y opresivo; tercero, permitir prueba de referencia inadmisible del testigo de cargo Miguel Alvarez Aponte y al negarse a instruir al Ministerio Público a que le entregara a la defensa copia de la declaración jurada del occiso Daniel Hernández Osorio sobre cuyo testimonio declarara el testigo de cargo el agente Miguel Alvarez Aponte; cuarto, no permitirle a la defensa impugnar el testimonio del testigo de cargo, el agente Daniel Cosme González, por la declaración de culpabilidad que hiciera éste por el delito de \ soborno ante el tribunal federal; quinto, tomar conocimiento judicial sobre denuncias y hechos de otros cargos criminales por los cuales el apelante Cruz Robles Calderón estuvo imputado; sexto, instruir al jurado sobre el proceso de vista preliminar y vista preliminar en alzada, según solicitado por el jurado luego de que el testigo principal de cargo Julio Osorio Pérez prestara su testimonio; séptimo, al ordenar que se le leyera al jurado las *979 dos (2) declaraciones de Julio Osorio Pérez cuando ya estaban en el proceso de deliberación; octavo, negarse a celebrar una vista al amparo de la Regla 9 de Evidencia en ausencia del jurado, en relación al testimonio del testigo de cargo José Maldonado; noveno, el panel de jurado emitió veredictos inconsistentes, aun cuando no se probó la culpabilidad de los acusados más allá de duda razonable; y décimo, dictar sentencia con agravantes y con su cumplimiento de forma consecutiva, violando el derecho constitucional del acusado contra castigos crueles e inusitados.
Recurso KLAN-1999-00627 del apelante Miguel Cirino Calderón
En el recurso KLAN-1999-00627, el apelante Miguel Cirino Calderón alega, en síntesis, que erró el tribunal de instancia al: primero, denegar la moción de recusación general del panel de secuestro y jurados; y al denegar la recusación motivada de una candidata que alegadamente demostró que no podía juzgar la causa con completa imparcialidad; segundo, que erró el jurado al aquilatar la prueba, pues el testimonio del único testigo del Ministerio Público es insuficiente, por lo que no se probó más allá de duda razonable la culpabilidad del apelante; y tercero, al admitir en evidencia el testimonio de Julio Osorio Pérez, aun habiendo éste roto su contrato de inmunidad.
A
Sobre la recusación general y las recusaciones motivadas
Como primer error, alegan los apelantes Cruz Robles Calderón, Luis Rivera González y Miguel Cirino Calderón que incidió el Tribunal de Primera Instancia al denegar la moción de recusación general del panel de jurados y al denegar tres (3) recusaciones motivadas durante el proceso de desinsaculación del jurado.
No le asiste razón.
La recusación general del jurado
La Constitución del Estado Libre Asociado de Puerto Rico en su Art. II Sec. 11 establece que:

En los procesos por delito grave, el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve.

Según se desprende de nuestra Constitución, todo acusado tiene derecho a que el panel de jurados que lo va a juzgar, esté compuesto por un grupo de personas representativo de la comunidad. De lo contrario, se violenta el derecho del acusado a un juicio por jurado. Pueblo v. Sánchez Pérez, 122 D.P.R. 606, 610 (1988); Pueblo v. Laboy, 110 D.P.R. 164, 167 (1980). Asimismo, la Regla 112 de Procedimiento Criminal establece que el jurado deberá estar compuesto por doce (12) vecinos del distrito. 34 L.P.R.A. Ap. II.
La Reglas 113 y 114 de Procedimiento Criminal, supra, establecen que tanto el Ministerio Público como el acusado pueden solicitar la recusación general, la cual deberá estar fundamentada en que el procedimiento de la selección del jurado estuvo desviado de las prácticas establecidas en las reglas, o en que intencionalmente se omitió citar a uno o más de los jurados sorteados. La moción de recusación general del jurado deberá de ser presentada, excepto por causa justificada, antes de que el panel de jurado preste juramento para ser examinados en cuanto a la capacidad de cada uno para actuar como jurado, por escrito y fundamentada. Reglas 115 y 116 de Procedimiento Criminal, supra.
*980 No obstante, el acusado tiene derecho a que el jurado esté compuesto por un grupo representativo de la comunidad. El hecho de que el panel de jurados no sea representativo de la comunidad, no es base suficiente para establecer que el proceso de selección fue discriminatorio. Por lo tanto, procede la denegación de una moción de recusación general del jurado cuando el acusado no establece un caso prima facie sobre discrimen en la selección del jurado y meramente se limita a alegar generalizaciones que no están apoyadas sobre prueba específica. Pueblo v. Laboy, supra, notas 1-3.
Aplicación del derecho a los hechos
En el caso de autos, la solicitud de recusación general de la defensa se fundamentó en que el proceso de sorteo había sido discriminatorio, pues el listado seleccionado estaba compuesto por ochenta y cuatro (84) prospectos de jurados, de los cuales solamente tres (3) eran residentes del pueblo de Loíza donde ocurrieron los hechos. El tribunal de instancia ordenó a la defensa a que sometiera su solicitud mediante moción escrita y lo refirió a otra sala, donde fue declarada no ha lugar sin la celebración de una vista.
La solicitud de los apelantes meramente se limitó a expresar que el proceso de sorteo había sido discriminatorio, sin expresar en qué manera lo fue y de qué forma afectaba los derechos de los acusados. El mero hecho de que los apelantes aleguen que él jurado no es representativo de la comunidad sin expresar los hechos específicos en los que se fundamenta la alegación, no es base suficiente para determinar que el proceso fue discriminatorio.
Además, la selección del jurado se hizo de la Región Judicial de Carolina en la que ocurrieron los hechos, el cual comprende los pueblos de Carolina, Trujillo Alto, Río Grande Canóvanas y Loíza. Por lo tanto, el proceso de sorteo no fue discriminatorio, pues los paneles de jurados fueron seleccionados de la Región Judicial en que ocurrieron los hechos, según lo establecen las reglas.
Ante tales circunstancias y por falta de fundamentos, se podía denegar de plano la moción de recusación general del panel de jurados.
Las recusaciones motivadas de los jurados
Por otro lado, durante el proceso de desinsaculación del jurado, tanto el acusado como el Ministerio Público tienen derecho a solicitar la recusación individual de los jurados. Regla 120 de Procedimiento Criminal, supra. Existen dos (2) tipos de recusación individual, la motivada y la perentoria; éstas sólo pueden realizarse antes de que se le tome juramento al jurado, excepto por justa causa que pueden realizarse antes de que se presente la prueba. Regla 121 de Procedimiento Criminal, supra.
Las recusaciones motivadas de un jurado, bajo dicha regla, pueden realizarse porque la persona tiene parentesco de consanguinidad o afinidad dentro del cuarto grado con el acusado, su abogado, el fiscal, con la persona que se alega agraviada o con aquélla cuya denuncia motivó la causa. Que tiene con el acusado o con la víctima relaciones de tutor y pupilo, de abogado y cliente, de patrono y empleado, o de propietario e inquilino. Que es parte contraria al acusado en una causa civil, o que lo ha acusado o ha sido acusado por él en un proceso criminal. Que ha actuado en jurado que ha juzgado a otra persona por los mismos hechos o ha pertenecido a otro jurado que juzgó la misma causa, o que tiene conocimiento personal de hechos esenciales en la causa o que no puede juzgar la causa con completa imparcialidad. Regla 121 de Procedimiento Criminal, supra.
Para que la recusación motivada sea válida, la misma debe estar fundamentada en uno de los preceptos antes citados de la Regla 121 de Procedimiento Criminal, supra. Pueblo v. Nazario Hernández, 138 D.P.R. 760, 772 (1995). Sin embargo, la concesión o denegación de las recusaciones motivadas, depende en gran parte de la discreción del tribunal sentenciador. Pueblo v. Prados García, 99 D.P.R. 384, 393 (1970).
*981 Aplicación del derecho a los hechos
En el presente caso se solicitó la recusación de cuatro (4) jurados y el tribunal de instancia sólo concedió una (1) de ellas. Las tres (3) recusaciones motivadas que no fueron concedidas por el tribunal fueron las siguientes: 1) la señora que manifestó ser religiosa y que en su opinión un testigo con inmunidad siempre diría la verdad, pero aclaró que al jurado le correspondía el resolver si decía la verdad o no; 2) el jurado que manifestó que en reiteradas ocasiones sufría de episodios depresivos para los cuales tomaba medicamentos y que dicha condición podría presentarse en cualquier momento, más aún, si se sometía a situaciones de tensión; 3) el jurado que manifestó que estaba en búsqueda de empleo y que de surgirle una oportunidad, la perdería por estar sirviendo como jurado, por lo que esto le hacía perder su atención como jurado. Ninguna de las manifestaciones de los jurados, sustentaban que no podrían juzgar los hechos con imparcialidad.
Según expresáramos anteriormente, para que una recusación motivada sea válida, la misma debe de estar fundamentada en uno de los preceptos establecidos en la Regla 121 de Procedimiento Criminal, supra. Además, la determinación de concederla o no, es discrecional del tribunal. En el caso de autos, ninguno de los fundamentos que alegó la defensa para las recusaciones motivadas denegadas por el tribunal, estuvieron fundamentadas.
Se alegó, de manera general, las recusaciones motivadas sin especificar las razones para ello. Además, las explicaciones dadas por los jurados potenciales a las preguntas, según antes expresamos, no los descualificaban, pues todos reconocieron que podían juzgar los casos con imparcialidad. Por lo tanto, el tribunal de instancia no abusó de su discreción al denegarlas.
B
Sobre la moción de suspensión
Como segundo error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de instancia al denegar la moción urgente solicitando transferencia de vista presentada por la representación legal del apelante Cruz Robles Calderón, el licenciado Colón, debido al conflicto de señalamientos entre el presente caso y uno de triple asesinato en el Centro Judicial de Humacao y al imponer un itinerario de trabajo extenuante y opresivo.
No le asiste razón.
En el caso de autos, dada la naturaleza de los procedimientos, el tribunal de instancia actuó diligentemente en el manejo de los procedimientos al pautar una agenda de trabajo sobre la cual todas las partes tenían conocimiento. El tribunal de instancia fue razonable, pues no podemos perder de vista la complejidad del caso ante su consideración.
Además, el tribunal de instancia suspendió los procedimientos por doce (12) días para darle oportunidad al licenciado Colón a recuperarse de su alegada enfermedad, y al así hacerlo, las partes estuvieron de acuerdo en que luego de dicho receso continuarían los procedimientos hasta tanto se terminara con el caso.
Concluimos que el tribunal no abusó de su discreción, pues actuó razonablemente en el manejo de los procedimientos, dada la naturaleza de los mismos, considerando que era una caso de más de un acusado por varios delitos y por jurado. Cf. Pueblo v. Ortega Santiago, 125 D.P.R. 203, 211 (1990).
C
Sobre la admisibilidad de prueba de referencia
Como tercer error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de *982 instancia al permitir prueba de referencia inadmisible del testigo de cargo Miguel Alvarez Aponte y al negarse a instruir al Ministerio Público a que le entregara a la defensa copia de la declaración jurada del occiso Daniel Hernández Osorio, sobre cuyo testimonio declarara el testigo de cargo, el agente Miguel Alvarez Aponte.
No le asiste razón.
La prueba de referencia es “[u]na declaración aparte de la que hace el declarante al testificar en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado”. Regla 60 de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV. Como regla general, la prueba de referencia no es admisible en evidencia. Regla 61 de las Reglas de Evidencia, supra.
La Regla 64(A), supra, establece la admisibilidad de prueba de referencia por excepción, cuando el testigo no está disponible. Se entiende que un testigo no está disponible cuando: 1) está exento o impedido de declarar, por razón de un privilegio reconocido en esta regla en relación al asunto u objeto de su declaración; 2) insiste en no declarar, a pesar de orden del tribunal para que declare; 3) testifica no recordar; 4) ha fallecido o está imposibilitado de comparecer a declarar, por razón de enfermedad o impedimento mental o físico; o 5) está ausente de la vista y el proponente de su declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del tribunal.
Una vez establecido que el testigo no está disponible para que su testimonio sea admisible como excepción a la prueba de referencia, el mismo debe cumplir con uno de los siguientes requisitos:

V) [.-I

(2) [...].

(3) Declaraciones contra interés. Una declaración que al momento de ser hecha era tan contraria al interés pecuniario o propietario del declarante o le sometía al riesgo de responsabilidad civil o criminal, o tendía de tal modo a desvirtuar una reclamación suya contra otro, o creaba tal riesgo de convertirlo en objeto de odio, ridículo o desgracia social en la comunidad, que un hombre razonable en su situación no hubiera hecho la declaración a menos que la creyera cierta.

Regla 64(B) de las Reglas de Evidencia, supra.
Los requisitos para la admisión de una declaración contra el interés propio son: 1) que el declarante esté muerto; 2) la declaración debe ser contra el interés pecuniario o de propiedad del declarante a la fecha de la declaración; 3) la declaración debe consistir de hechos conocidos personalmente por el declarante; 4) el declarante no debe haber tenido un motivo probable para falsificar los hechos declarados; 5) el declarante se dio cuenta o como una persona corriente debió haberse dado cuenta de que la declaración era contra su propio interés. Acosta v. Bienvenido Crespo, 70 D.P.R. 239, nota 9 (1949).
Cuando un coautor testifica sobre una declaración contra interés que fue prestada previamente por otro acusado de haber cometido el delito, este testimonio tiene una presunción de no confiabilidad, por lo que no será admisible. Sin embargo, esta presunción es una controvertible cuando existen circunstancias especiales sobre elementos de confiabilidad o corroboración, que justifiquen su admisibilidad. Pueblo v. Rodríguez Tirado, 143 D.P.R. 444, 467 (1997); Pueblo v. De Jesús Ayuso, 119 D.P.R. 21, 36 (1987).
*983 La doctrina sobre que una declaración contra interés de un coacusado que incrimine a otro acusado, no es admisible; no es de aplicación cuando el declarante no ha sido acusado como coautor del delito a ser juzgado. Sobre este particular, nuestro más alto foro en Pueblo v. Rodríguez Tirado, supra, págs. 467-468, expresó lo siguiente:

La doctrina expuesta se desarrolló para proteger a coacusados de los testimonios incriminatorios de otros acusados, quienes pueden tener como su razón de declarar, no la verdad requerida por su juramento, sino la intención de arrojar el peso de la culpa para no tener que cargarlo. El caso de autos no se presta a la aplicación tradicional de esa doctrina. Nótese que Rodríguez Adames [Daniel Hernández Osorio] no ha sido acusado como coautor de los asesinatos de O'Neill y Torres Soto [Daniel Hernández Osorio y Víctor Colón Ayala] en este proceso judicial. [...] La situación ante nos, no tiene que ver con un coautor que presente declaraciones contra interés para imputarle culpabilidad a otro [...]. Por las razones expuestas, entendemos que la doctrina no es aplicable a situaciones como la del caso de autos, en que los declarantes de las expresiones contra interés no has sido aún acusados como coautores de los delitos a ser juzgados. (Enfasis suplido.)

Aplicación del derecho a los hechos
En el caso de autos, la declaración de Daniel Hernández Osorio es admisible como excepción a la prueba de referencia, pues constituye una declaración contra interés de un testigo que no está disponible por razón de que falleció. La declaración era contra interés, pues éste declaró sobre actividades ilegales de una empresa criminal a la cual él pertenecía y en la cual incriminaba al apelante Cruz Robles Calderón en otro caso de asesinato anterior al presente.
Daniel Hernández Osorio no era un coacusado que prestó una declaración contra interés para que los apelantes cargaran con la culpa, sino que su declaración contra interés se presentó para probar el motivo del delito cometido por los apelantes que fue su muerte, pues éste era el testigo principal del Ministerio Público en otro caso en contra del apelante Cruz Robles Calderón. Por lo tanto, su declaración contra interés, según la norma jurídica antes expresada, era admisible en evidencia como excepción a la prueba de referencia.
Concluimos que el Tribunal de Primera Instancia actuó correctamente al permitir, como excepción a la prueba de referencia, el testimonio del testigo de cargo Miguel Alvarez Aponte sobre la declaración contra interés que hiciera el occiso Daniel Hernández Osorio.
Por otro lado, la alegación de los apelantes de que el tribunal de instancia erró al negarse a instruir al Ministerio Público a que le entregara a la defensa copia de la declaración jurada del occiso Daniel Hernández Osorio sobre cuyo testimonio declarara el testigo de cargo el agente Miguel Alvarez Aponte, no tiene mérito. Según surge de la transcripción, el Ministerio Público le ofreció a la defensa copia de dicha declaración y éstos se negaron a recibirla. Veamos:

Fiscal: Si el compañero quiere, yo le puedo dar la declaración al compañero. Yo no tengo problema con eso.

Ledo. Juliá: No, señor; no, señor.

*984 (T.E. Juicio I, pág. 127.)
Concluimos que el error no fue cometido.
D
Sobre la impugnación de credibilidad mediante convicciones previas
Como cuarto error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de instancia al no permitirle a la defensa impugnar el testimonio del testigo de cargo, el agente Daniel Cosme González, por la declaración de culpabilidad que hiciera éste por el delito de soborno ante el tribunal federal.
No le asiste razón.
La Regla 46 de Evidencia, establece lo siguiente:

(A) Sujeto a lo establecido en el inciso (B) de esta regla, es admisible, con el propósito de impugnar la credibilidad de un testigo, evidencia de que éste ha sido convicto de delito, si tal convicción es acepada por el testigo o establecida mediante récord público, pero únicamente si el delito, independientemente de su clasificación, envuelve deshonestidad o falso testimonio.

32L.P.R.A. Ap.IV.
Por lo tanto, queda claramente establecido que la credibilidad de un testigo sólo puede ser impugnada por la convicción de un delito que envuelva deshonestidad o falso testimonio.
Aplicación del derecho a los hechos
En el caso de autos, no existía convicción por el delito de soborno ante el Tribunal Federal en contra del testigo de cargo, el agente Daniel Cosme, sino una alegación de culpabilidad que éste hiciera en el caso de soborno que aún no había sido resuelto. Por lo tanto, no procedía que se impugnara su credibilidad por convicciones anteriores, pues no existía convicción alguna.
Concluimos que actuó correctamente el Tribunal de Primera Instancia al no permitir la impugnación de credibilidad del testimonio del agente Daniel Cosme con su alegación de culpabilidad por un caso de soborno ante el Tribunal Federal, toda vez que no existía convicción.
E
Sobre tomar conocimiento judicial sobre denuncias y hechos de otros cargos criminales
Como quinto error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de instancia al tomar conocimiento judicial sobre denuncias y hechos de otros cargos criminales por los cuales el apelante Cruz Robles Calderón estuvo imputado.
No le asiste razón.
Independientemente de los méritos del planteamiento, los apelante no objetaron oportunamente el que se *985 tomara conocimiento judicial sobre otras denuncias y cargos por los cuales el apelante Cruz Robles Calderón estuvo imputado, sino que meramente se limitaron a expresar al tribunal de instancia su preocupación por la influencia que pudiera tener dicha prueba en las mentes del jurado. Por lo tanto, los apelantes están impedidos de levantar dicha objeción por primera vez en apelación. Pueblo v. Rivero, Lugo y Almodóvar, 121 D.P.R. 454, 475-476 (1988).
De un examen de la prueba presentada, no surge que la misma sea perjudicial como para que se deba considerar la objeción por primera vez en apelación. Pueblo v. Rivero, Lugo y Almodóvar, supra, pág. 476.
No obstante, aun en la circunstancia de haberse cometido el error, el mismo no es perjudicial, por lo que no procedería la revocación de la condena de haberse cometido, pues el resultado del caso, según surge del expediente, sería el mismo. Pueblo v. Sánchez Molina, 134 D.P.R. 577, 595 (1993).
F
Sobre instrucciones al jurado del proceso de vista preliminar y alzada
Como sexto error, alegan los apelantes Robles Calderón y Rivera González que erró el tribunal de instancia al instruir al jurado sobre el proceso de vista preliminar y vista preliminar en alzada, según solicitado por el jurado luego de que el testigo principal de cargo Julio Osorio Pérez prestara su testimonio.
Sobre el error alegado basta con señalar que los apelante no lo discutieron en sus alegatos. Por lo tanto, no es materia a ser evaluada en el trámite apelativo. Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 165 (1996); Pueblo v. Adorno Cabrera, 133 D.P.R. 839, 857 (1993).
G
Sobre leerle al jurado las declaraciones del testigo principal de cargo mientras se encontraban en el proceso de deliberación
Como séptimo error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de instancia al ordenar que se le leyera al jurado las dos (2) declaraciones del testigo Julio Osorio Pérez, cuando ya estaban en el proceso de deliberación.
No le asiste razón.
Nuevamente, los apelantes pretenden objetar ahora en apelación, el procedimiento, sin haberlo hecho oportunamente ante el tribunal de instancia. Según surge de la transcripción, en ninguna de las dos (2) ocasiones en que se leyeron las declaraciones del testigo de cargo Julio Osorio Pérez, las partes presentaron oportunamente una objeción a ello. Por lo tanto, los apelantes están impedidos de levantar dicha objeción por primera vez en apelación. Además, la lectura de las declaraciones tampoco, en las circunstancias de estos casos, es un error perjudicial que merezca ser considerado por primera vez a nivel apelativo. Pueblo v. Rivero, Lugo y Almodóvar, supra, págs. 475-476.
H
Sobre la celebración de una vista al amparo de la Regla 9 de Evidencia
Como octavo error, alegan los apelantes Robles Calderón y Rivera González que erró el tribunal de instancia al negarse a celebrar una vista al amparo de la Regla 9 de Evidencia en ausencia del jurado, en relación al testimonio del testigo de cargo José Maldonado.
No le asiste razón.
*986 La Regla 4 de Evidencia establece que no se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia, a menos que: 1) la evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada; y 2) la admisión errónea de la evidencia fue un factor decisivo o sustancial en la sentencia o decisión. 32 L.P.R.A. Ap. IV; Pueblo v. Rosaly Soto, 128 D.P.R. 729, 744 (1991).
Una vez establecido el hecho de que la evidencia en controversia fue admitida por el foro de instancia, a pesar de la oportuna y correcta objeción de la parte perjudicada, el foro apelativo se limitará a determinar si la referida evidencia fue o no factor decisivo o sustancial en el resultado del caso. Pueblo v. Rosaly Soto, supra.
El criterio que debe utilizarse para determinar si es un factor decisivo o sustancial, es si de no haberse admitido erróneamente la prueba en controversia probablemente el resultado hubiera sido distinto. Es decir, si la evidencia erróneamente admitida tuvo una influencia notable, determinante, y hasta desmedida, en la mente del juzgador de los hechos. Pueblo v. Rosaly Soto, supra, pág. 745; Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 786-787 (1991).
El tribunal apelativo deberá considerar, entre otros, los siguientes factores: 1) si el proceso fue celebrado ante Jurado o por tribunal de derecho; 2) si el resto de la prueba presentada por el Estado fue una de carácter circunstancial o, por el contrario, la misma consistió de evidencia directa; 3) si el error cometido fue uno "ordinario" o, por el contrario, uno de los catalogados por el Tribunal Supremo de los Estados Unidos como constitucional. Pueblo v. Ruiz Bosch, supra, pág. 787 (1991).
Aplicación del derecho a los hechos
En el caso de autos, ciertamente el tribunal de instancia permitió algunos de los extremos del testigo Juan B. Maldonado que puede considerarse prueba de referencia ante el jurado, para luego determinar que la misma era inamisible. No obstante, dicha prueba no fue un factor decisivo o sustancial, pues el resultado del caso sería el mismo, independientemente de lo declarado por Juan B. Maldonado.
I
Sobre veredictos inconsistentes y duda razonable
Como noveno error, alegan los apelantes que incidió el tribunal de instancia al permitir que panel de jurado emitiera veredictos inconsistentes y que no se probó la culpabilidad de los acusados más allá de duda razonable.
No le asiste razón.
Veredictos inconsistentes
Nuestro más alto foro reiteradamente ha expresado que no es necesario demostrar consistencia lógica cuando un jurado emite veredictos de culpabilidad en cuanto a unos cargos y veredictos de no culpabilidad en cuanto a otros, por lo cual los veredictos inconsistentes son válidos. Por lo tanto, no constituye un error que de lugar a revocación, el hecho de que un jurado emita veredictos que no guarden consistencia lógica entre sí respecto a diferentes pliegos acusatorios. Pueblo v. Adorno Carrera, supra, págs. 964-865; Pueblo v. Gómez Nazario, 121 D.P.R. 66, 75 (1988).
Duda razonable
Para que la prueba establezca la culpabilidad del acusado más allá de duda razonable, se requiere que el Estado establezca todos los elementos del delito y la conexión del acusado con el delito. Pueblo v. Colón Burgos, 140 D.P.R. 564, 581-82 (1996). La evidencia tiene que producir una certeza o convicción moral en una *987 conciencia exenta de preocupaciones o en un ánimo no prevenido. Pueblo v. González Román, 138 D.P.R. 691, 708 (1995).
Duda razonable no equivale a que toda duda posible, especulativa o imaginaria, tenga que ser destruida para establecer la culpabilidad del acusado con certeza matemática. Meramente significa que para establecer la culpabilidad del acusado se exige prueba que establezca aquella certeza moral que convence, que dirige la inteligencia y que satisface la razón. Pueblo v. Calderón Alvarez, 140 D.P.R. 627, 643-44 (1996).
Aplicación del derecho a los hechos
De acuerdo a la norma jurídica antes expresada, el hecho de que en el presente caso el jurado haya rendido veredictos inconsistentes en cuanto a las acusaciones en contra del apelante Cruz Robles Calderón, no constituye un error que de lugar a la revocación de las sentencias, pues los mismos son válidos.
Hemos examinado la prueba presentada ante el jurado, y de un examen de la misma surge que ésta es suficiente para establecer la culpabilidad de los apelantes más allá de duda razonable. Esta estableció los elementos de todos los delitos imputados, según los establecen nuestro Código Penal y la Ley de Armas. Por lo tanto, la culpabilidad de los apelantes se probó más allá de duda razonable.
J
Sobre la imposición de penas a ser cumplidas consecutivamente
Como décimo error, alegan los apelantes Robles Calderón y Rivera González que incidió el tribunal de instancia al dictar sentencia con agravantes y con su cumplimiento de forma consecutiva, violando el derecho constitucional del acusado contra castigos crueles e inusitados.
No le asiste razón.
El artículo 60 del Código Penal establece que al imponer penas con agravantes o atenuantes, dentro de los límites establecidos por la ley, se deberá tomar en consideración lo siguiente: 1) la naturaleza de la acción u omisión; 2) los medios empleados; 3) la importancia de los deberes transgredidos; 4) la extensión del daño o peligro causado; 5) la edad, educación, historial social y reputación del autor; 6) la conducta relacionada con el delito antes, durante y después de la comisión del mismo; 7) la calidad de los móviles del hecho; y 8) la conducta de la víctima relacionada con la transacción delictuosa. 33 L.P.R.A. see. 3284.
Por otro lado, nuestro más alto foro ha sostenido que la imposición de penas a ser cumplidas consecutivamente, descansa en la sana discreción del tribunal. Ello no constituye un castigo cruel e inusitado, cuando el juzgador de los hechos tomó en consideración la naturaleza de los delitos y el hecho de que las penas decretadas caígan dentro de los límites fijados por un estatuto. Pueblo v. Hernández Mercado, 126 D.P.R. 427, 434 (1990); Pueblo v. Burgos Hernández, 113 D.P.R. 834, 842 (1983).
Aplicación del derecho a los hechos
En el caso de autos, la naturaleza de los delitos cometidos, las circunstancias que rodearon los hechos que dieron lugar a los asesinatos y la manera en que se llevaron a cabo los mismos, nos llevan a concluir que no constituye un castigo cruel e inusitado el hecho de que el tribunal de instancia haya dictado las penas con agravantes. Asimismo, por las mismas razones, tampoco abusó de su discreción al sentenciar a los apelantes a cumplirlas consecutivamente.
*988 Sobre el acuerdo de inmunidad
Alega el apelante Miguel Cirino Calderón, que incidió el Tribunal de Primera Instancia al aceptar el testimonio de Julio Osorio Pérez, cuando éste no cumplió el acuerdo de inmunidad.
El error no fue cometido.
Independientemente del acuerdo de inmunidad del testigo Julio Osorio Pérez, el jurado le dio valor a su testimonio y ello no es un error para revocar las sentencias. Además, el apelante se limitó a alegar el error sin discutirlo. Pueblo v. Adomo Cabrera, supra, pág. 857.
IV
Por los anteriores fundamentos, se confirman las sentencias apeladas.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General